# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>v.<br><br>Iliana Yukie Salazar (4),<br><br>    Defendant. | Case No. 16-cr-264 (SRN/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

Bradley M. Endicott, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for United States of America

Robert A. Lengeling, 310 Fourth Avenue South, Suite 1050, Minneapolis, MN 55415, for Iliana Yukie Salazar.

---

HILDY BOWBEER, United States Magistrate Judge

This matter is before the Court on Defendant Iliana Yukie Salazar's Motion to Suppress Statements [Doc. No. 81] and Motion to Suppress Evidence Obtained from Search and Arrest Warrants[1] [Doc. No. 83].  Salazar's non-dispositive motions were addressed in a separate Order [Doc. No. 105].  The matter has been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a).

---

[1]  Notwithstanding the title of the motion, it does not appear that Salazar is in fact challenging any arrest warrant.

## I.    Procedural Background

On October 4, 2016, Defendant Iliana Yukie Salazar was charged by Indictment with one count of conspiracy to distribute methamphetamine and one count of possession with intent to distribute methamphetamine. (Indictment at 1-3 [Doc. No. 1].) Salazar filed the motions to suppress on November 16, 2016. The Government opposed the motions.

The Court held the pretrial motion hearing on January 3, 2017 [Doc. No. 101]. During the hearing, the Government called Detective Freddy Muñoz. The Government also submitted the following seven exhibits: (1) Application, affidavit, and warrant for tracking device (March 2016) (Gov't Ex. 1) (hereafter March 2016 cellphone warrant); (2) Application, affidavit, and warrant for tracking device (May 2016) (Gov't Ex. 2) (hereafter May 2016 cellphone warrant); (3) Application, affidavit, and search warrant for Georgia residence (Gov't Ex. 3); (4) Application, affidavit, and search warrant for Anoka County residence (Gov't Ex. 4); (5) Transcript of post-Miranda statement (Gov't Ex. 5); (6) Miranda Warning/Waiver of Rights Form (Gov't Ex. 6); and (7) Audio CD of Salazar statement (Gov't Ex. 7). Salazar did not call any witnesses or submit any exhibits.

Salazar submitted supplemental post-hearing briefing in support of her motions on January 31, 2017 [Doc. No. 115]. The Government submitted its supplemental memorandum in opposition on February 22, 2017 [Doc. No. 122]. The Court took the motions under advisement at that time.

For the reasons set forth below, the Court recommends that both motions be denied.

## II.    Relevant Facts

### A.    Investigation and Search Warrants in Minnesota and Georgia

In March 2016, Special Agent Andrew Johnson of the Minnesota Bureau of Criminal Apprehension applied for the installation of "a pen register, trap and trace device including caller identification, electronic tracking device, and/or cellular tower location and service information, including services such as Global Positioning System (GPS) technology, precision location related technologies, and/or a tracking warrant" for Salazar's cell phone.  (Gov't Ex. 1.)  In his affidavit in support of the application, Special Agent Johnson affirmed that he had learned Salazar had a major role within a drug trafficking organization.  (*Id.* at 3.)  Specifically, he had obtained bank documents that showed approximately $92,000 in cash passed through her bank accounts over a two-month period of time.  (*Id.*)  He also obtained documents that showed she sent money through electronic money transfers to various subjects in the San Luis Rio Colorado, and Sonora, Mexico regions.  (*Id.*)  Special Agent Johnson also included text messages between an individual known as "Lil" and a subject who had been arrested for possessing more than 100 grams of methamphetamine.  (*Id.* at 3-4.)  Based on his experience and expertise, Special Agent Johnson stated he believed the text messages, which included one in which "Lil" texted her bank account number to the other individual so that individual could deposit money into the account, pertained to the coordination of a drug payment.  (*Id.*)  Special Agent Johnson affirmed that he also knew Iliana Salazar as "Lil."

3

(*Id.* at 4.)  Additionally, one of the messages from the phone number Special Agent Johnson believed to be Salazar's stated "iliana y Salazar," which was followed by information for a savings bank account.  (*Id.*)  A Blue Earth County district court judge granted the application on March 17, 2016.  (*Id.* at 8.)  The same judge issued a second warrant for the same cell phone on May 20, 2016.  (Gov't Ex. 2.)

During the pretrial hearing, Detective Freddy Muñoz of the Anoka County Sheriff's Office testified on behalf of the Government in opposition to Salazar's motion to suppress statements.  (Tr. at 12 [Doc. No. 109].)  Detective Muñoz has been employed by the Anoka County Sheriff's Office since 2005, and during the events pertinent to this motion, he was a member of the Anoka-Hennepin Narcotics and Violent Crimes Task Force.  (*Id.* at 13.)  As a member of that task force, his duties included investigating narcotics and violent crimes as well as interviewing criminal suspects.  (*Id.*)

On June 8, 2016, Detective Muñoz assisted the task force in executing a search warrant on a residence in Oak Grove, Minnesota.  (*Id.* at 13-14, 18.)  Detective Muñoz testified that Salazar resided in that house but was not present during the execution of the search warrant.  (*Id.* at 14.)  During the execution of the search warrant, officers discovered and seized approximately ten pounds of methamphetamine.  (*Id.*)

After police seized the methamphetamine, they tracked Salazar's cell phone to a suburb near Atlanta, Georgia.  (*Id.* at 16.)  Minnesota law enforcement coordinated with Georgia law enforcement to monitor Salazar's whereabouts via her phone and likely vehicle.  (*Id.*; Gov't Ex. 4 at 2.)  Georgia police eventually located Salazar and detained her during a traffic stop.  (Gov't Ex. 4 at 1.)  They then applied for a warrant to search the

residence Salazar had just left and there recovered 32.01 pounds of methamphetamine. (*Id.* at 8; Gov't Ex. 4 at 2.)

### B.    Salazar's Post-Arrest Statement

On June 10, 2016, Detective Muñoz traveled to Georgia to speak with Salazar in the Gwinnett County Jail. (Tr. at 18-19.) Detective Muñoz spoke to Salazar along with Special Agent Johnson, Special Agent Anthony Fletcher, also of the Minnesota Bureau of Criminal Apprehension, and Detective Ross of the Lilburn (Georgia) Police Department. (*Id.* at 19-20; Gov't Ex. 4.) They conducted the interview in an office-style room, with a desk and windows. (Tr. at 19-20.) The officers conducted the interview in English, and Special Agent Johnson began the interview by reading Salazar her *Miranda* rights, *i.e.*, that she had the right to remain silent, that anything she said could be used against her in court, that she had the right to an attorney, and that if she could not afford an attorney one would be appointed for her. (*Id.* at 20-21; Gov't Ex. 5 at 1.) Special Agent Johnson then asked Salazar if she had any questions, and she replied no. (Tr. at 22.)

After the interview began, Salazar told the interviewers that she could not focus because she had not taken her medication. (Gov't Ex. 5 at 5.) She stated that she took medication for migraines, anxiety, and depression and that she had just seen a nurse at the facility, but had not yet received any medication. (*Id.*) Later during the interview, she again stated that she was not focusing. (*Id.* at 8.) After answering several additional questions, Salazar described her headache as having lasted for days and stated that the facility had not allowed her to take her medication. (*Id.* at 9-10.) She continued to answer questions, however. As the interview drew to a conclusion, Salazar again stated

that she could not focus.  After a few more questions, the interrogating officers told her

they had discovered drugs in the house to which she had been connected while in

Georgia, and that 10.5 pounds of methamphetamine had been found in a search of her

Minnesota residence.  At those revelations she invoked her right to remain silent and to

speak to an attorney.  (*Id.* at 12-14.)

Detective Muñoz testified at the motions hearing that Salazar appeared calm

throughout the interview, although she mentioned she had a headache.  (Tr. at 22.)

Detective Muñoz also testified that she appeared to understand the questions asked of her,

gave normal responses, and appeared coherent throughout the interview.  (*Id.* at 23.)  The

interview lasted approximately twenty minutes.  (*Id.* at 24.)

At the end of the interview, after Salazar invoked her *Miranda* rights, Special

Agent Johnson handed Salazar a "*Miranda* Warning/Waiver of Rights" form (Gov't

Ex. 6), stating that he was "gonna have you sign it, just acknowledging that I read it to ya,

okay?"  (Gov't Ex. 5 at 14.)  He went on to explain "And then after you read it, said that

you understand (inaudible), go ahead and check 'em if you will, just acknowledging that

you understand it.  Make sure I read it and explained it."  (*Id.*)

The form had two sections, one headed "Miranda Warning" and the other headed

"Waiver of Rights (Renuncia de Derechos)."  In the "Miranda Warning" section, Salazar

placed a checkmark next to statements that told her in both English and Spanish that she

had the right to remain silent, anything she said could and would be used against her in a

court of law, she had the right to talk to a lawyer, and if she could not afford a lawyer,

one would be appointed to her free of charge.  (Tr. 28; Gov't Ex. 6.)  She did not,

however, place a checkmark by the statement that told her she could "decide at any time to exercise these rights and not answer any questions or make any statement." (Gov't Ex. 6.)

In the "Waiver of Rights" section, there were three additional statements, also set forth in both English and Spanish, and each preceded with a blank for a checkmark or other indication of agreement or acknowledgement: (1) "I understand each of the above rights that have been read to me; (2) "Having the rights in mind, I want to waive these rights and talk voluntarily of my own free will and accord;" and (3) "I am not under the influence of alcohol or drugs." The first and third statements in this section are marked,[2] but there is no mark next to the second statement. (*Id.*; Tr. 29.) None of the interrogating officers asked her why she did not mark the second statement. (Tr. 31.) After reading the document and checking off statements, Salazar signed it. (Tr. 28-29; Gov't Ex. 6.)

### III.    Motion to Suppress Statements

Salazar argues that her custodial statements to police should be suppressed for two reasons. First, she argues that she did not waive her *Miranda* rights because she did not mark the second statement on the "*Miranda* Warning/Waiver of Rights" form, which explicitly waived those rights. Second, Salazar argues that even if she did waive her

---

[2] With regard to the third statement, Special Agent Johnson asked Salazar whether she was under the influence of alcohol or drugs, and when she denied it, told her he would mark the third statement in the "Waiver of Rights" section if that was alright with her. (Gov't Ex. 5 at 14.) Salazar did not audibly respond, and since there is a star-shaped mark next to that statement, unlike the ones above, the Court concludes it was Special Agent Johnson who put it there. (Gov't Ex. 5 at 14; Gov't Ex. 6.)

*Miranda* rights, her waiver was not voluntary because she was experiencing a migraine during the interview.

Under *Miranda v. Arizona*, "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. 436, 444 (1966).  Those procedural safeguards are met when, "[p]rior to any questioning, the person [is] warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Id.*  *Miranda* warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way."  *Stansbury v. California*, 511 U.S. 318, 322 (1994).

## A.    Whether the Statements Should be Suppressed Because Salazar Did Not Waive Her *Miranda* Rights in Writing

Salazar argues that her custodial statements to police should be suppressed because she did not check the applicable statement on the waiver of rights form, and therefore the police did not obtain a knowing, intelligent, and voluntary waiver of her *Miranda* rights before they questioned her.

The Eighth Circuit has recognized that an individual can waive her *Miranda* rights if the waiver is "made voluntarily, knowingly and intelligently, but [*Miranda*] does not demand that it be made in writing."  *United States v. Zamarripa*, 544 F.2d 978, 981 (8th Cir. 1976) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)); *see also Thai v. Mapes*,

412 F.3d 970, 977 (8th Cir. 2005) ("[W]aiver is not a question of form, but of substance."); *United States v. Duran*, 109 F. Supp. 3d 1093, 1104 (D. Minn. 2015) ("[A] waiver can be made orally or in writing; it need not assume any particular form.").

Furthermore, a waiver does not have to be express; it can be implied from the circumstances. *North Carolina v. Butler*, 441 U.S. 369, 374-75 (U.S. 1979) ("[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'") (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Elaborating on implied waiver, the Supreme Court has stated that the "*Miranda* rule and its requirement are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions." *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010). Implied waiver can be found when an individual who has heard and understood her rights, without expressly stating or writing that she is waiving her *Miranda* rights, starts talking with the questioning officers. *Id.* at 385 ("As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.").

Salazar appears to argue that she expressly invoked her *Miranda* rights by refusing to sign the waiver statement at the beginning of the interview. However, her argument fails for several reasons. First, it is apparent from the transcript of the interrogation that the officers did not give Salazar the form until the end of the interrogation. (Gov't Ex. 5 at 14.) Thus, it does not appear that she refused to check or otherwise acknowledge any

9

particular statement before questioning began. Instead, Special Agent Johnson orally advised Salazar of her rights at the beginning of the interrogation. (*Id.* at 1.) Salazar said she did not have any questions about these rights (*id.*), then answered the officers' questions throughout the interrogation, declining to answer questions she was not comfortable answering (*see, e.g.*, *id.* at 11, refusing to give the officers the phone number of a companion), and invoking her right to remain silent and to consult a lawyer toward the end of the conversation. (*Id.* at 12.) The form makes its first appearance in the transcript only at the end of her interview, after Salazar invokes her *Miranda* rights. The Court concludes that even though Salazar did not waive her rights in writing before questioning began, she heard her rights, understood them, was given an opportunity to invoke them before she was questioned, and knowingly waived those rights when she began answering the officers' questions.

**B.    Whether the Statements Should Be Suppressed On the Ground That Salazar's Statements Were Involuntary**

Salazar also argues that her custodial statements to police should be suppressed because her physical and mental condition – specifically, a possible migraine headache and an inability to focus – precluded her from giving a voluntary waiver of her *Miranda* rights. (Def.'s Mem. Supp. Mot. Suppress at 3 [Doc. No. 115].)

The parties have identified no cases in the Eighth Circuit that address the issue of whether the inability to focus and a migraine headache invalidate an otherwise valid waiver of *Miranda* rights, and the Court has found none. However, various mental impairments, such as alcohol impairment, drug impairment, or sleeplessness, are factors

10

to be considered among the "totality of circumstances" in determining whether waiver was voluntary. *United States v. Gaddy*, 532 F.3d 783, 788-89 (8th Cir. 2008); *United States v. Castro-Higuero*, 473 F.3d 880, 886 (8th Cir. 2007); *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990) (identifying that mental impairments do not render a confession involuntary unless they "caused the defendant's will to be overborne"). In this "totality of circumstances" assessment, a refusal to disclose information to police is one indicator that the defendant's will has not been overborne. *Casal*, 915 F.2d at 1229. A defendant's appearance of being "sober and in control of his faculties at the time he consented" also indicates that the defendant's will has not been overborne. *United States v. Contreras*, 372 F.3d 974, 977 (8th Cir. 2004).

Here, the totality of the circumstances surrounding the interrogation indicates that even if Salazar had some difficulty focusing and was experiencing a migraine, she still knowingly, intelligently, and voluntarily waived her *Miranda* rights. Several facts support the voluntariness of Salazar's waiver and her control of her faculties. First, despite her comments deprecating her ability to focus, review of the interview transcript and audio recording shows that for twenty minutes Salazar responded coherently, timely, and with considerable detail to the officers' questions. There were no particularly long pauses or jumbled responses after any question that would indicate clouded or wandering thinking. Second, Salazar does not argue that the waiver was made under threat or coercion, and nothing in the record suggests such. *See United States v. Vega*, 676 F.3d 708, 718 (8th Cir. 2012). Third, Salazar made a conscious and deliberate decision to not give the officers the phone number of a companion. Fourth, after being told that

methamphetamine was seized from her residence, she made the choice, to which she stuck firmly and consistently, to invoke her *Miranda* rights. Therefore, the Court concludes Salazar knowingly, intelligently, and voluntarily waived her *Miranda* rights, and the Court recommends her Motion to Suppress Statements be denied.

## IV. Motion to Suppress Evidence Obtained from Search Warrants

Salazar argues that the Court should suppress evidence obtained from the March 2016 and May 2016 cellphone warrants because they were issued in violation of both state and federal statutes, and without probable cause. She challenges the search warrant for her Georgia residence[3] on the ground that if the evidence obtained as a result of the cellphone warrants is suppressed, there was no probable cause for the Georgia warrant.[4]

### A. Whether the Cellphone Warrants Were Invalid On the Ground They Were Issued in Violation of State Law

Salazar argues that the March and May 2016 cellphone warrants issued by a Blue Earth County District Court judge violated Minn. Stat. § 626A.37 and 18 U.S.C. § 3122[5] because the tracking was not conducted within the jurisdiction of Blue Earth County and

---

[3] In her initial motion, Salazar also challenged the search warrant for her Anoka County residence, but withdrew her challenge to this search warrant in her supplemental briefing. (Def.'s Mem. Supp. Mot. Suppress at 7-8.)

[4] Salazar concedes that if the evidence from the cellphone warrants is not suppressed, there was probable cause for the Georgia warrant. (Def.'s Mem. Supp. Mot. Suppress at 7.)

[5] Salazar contends that the Blue Earth County District Judge issued the warrants pursuant to Minn. Stat. § 626A.37 and 18 U.S.C. § 3122 because the applications and resulting warrants identify those sections as the statutory basis for the applications and warrants.

because the search warrant applications failed to define geographical limits, other than referring to "cellular towers in the specified market."

Minn. Stat. § 626A.37 provides that a "court may enter an ex parte order authorizing the installation and use of a pen register, trap and trace device, or mobile tracking device within the jurisdiction of the court . . . ."  The Government does not dispute that Salazar's cellphone was tracked outside Blue Earth County but argues that Minn. Stat. § 626A.37 does not require suppression of the evidence in this case for two reasons.  First, it argues, while the applications and warrants cite Minn. Stat. § 626A.37 as the statutory basis for their issuance, the applicable statute insofar as the warrants authorized the tracking of Salazar's cellphone location was Minn. Stat. § 626A.42, which does not include a jurisdictional limit, but provides simply that "a government may not obtain the location information of an electronic device without a tracking warrant."  In *United States v. Alarcon*, No. 15-cr-278(3) (DSD/JJK), 2016 WL 2844164, at *5 (D. Minn. Apr. 26, 2016), *R. & R. adopted*, No. 15-cr-2783(3) (DSD/TNL), 2016 WL 2733403 (D. Minn. May 10, 2016), Magistrate Judge Jeffrey J. Keyes explained the "clear distinctions between cell phone tracking addressed by § 626A.42 and mobile device tracking that is the subject of § 626A.37," observing that "[m]obile device installation as anticipated in § 626A.37 is a physical intrusion, however slight, that can be commenced at a known time and location."  He concluded the limitations of § 626A.37 did not apply to a cellphone tracking warrant.  Similarly, in this case the warrant did not authorize a physical intrusion at a known location to install a GPS tracking device on, for example, an automobile.  Rather, as in *Alarcon*, it authorized tracking of cellphone

13

location based on signals from nearby cell towers. This Court agrees with the reasoning in *Alarcon* and finds that § 626A.42 was the applicable statute for these warrants insofar as they authorized cellphone location tracking.

Second, the Government argues that even if the warrants did not comply with the provisions of applicable state law, that does not require suppression of the evidence obtained. The Court agrees. The Eighth Circuit has recognized that "federal courts do not suppress evidence seized by state officers in conformity with the Fourth Amendment because of state law violations." *United States v. Kelley*, 652 F.3d 915, 917 (8th Cir. 2011) (quoting *United States v. Appelquist*, 145 F.3d 976, 978 (8th Cir. 1998)). Instead, where state law enforcement officers obtain evidence that is used in a federal prosecution, the federal court determines the legality of the search and seizure under a Fourth Amendment analysis (*see* subsection B, *infra*), not by reference to state law. *Id.*

**B.    Whether the Cellphone Warrants Were Invalid On the Ground They Were Issued in Violation of Federal Law**

Salazar argues the cellphone warrants violated Federal Rules of Criminal Procedure 41(e)(2)(c) and 41(f)(2)(A). Federal Rule of Criminal Procedure 41(e)(2)(C) provides in pertinent part:

> A tracking-device warrant must identify the person or property to be tracked, designate the magistrate judge to whom it must be returned, and specify a reasonable length of time that the device may be used. The time must not exceed 45 days from the date the warrant was issued. The court may, for good cause, grant one or more extensions for a reasonable period not to exceed 45 days each.

Salazar contends Rule 41 was violated because the cellphone warrants were issued for a period of sixty days and they failed to designate a magistrate judge for return of the warrant.

The Government responds that Rule 41 does not apply where the warrant was issued by a state court judge. The Federal Rules of Criminal Procedure govern "criminal proceedings" in federal courts and state proceedings only "[w]hen a rule so states." Fed. R. Crim. P. 1(a). As the United States Court of Appeals for the Fourth Circuit held in *United States v. Claridy*, 601 F.3d 276, 282 (4th Cir. 2010), "the triggering condition for application of Rule 41 is not a finding that the *investigation* was federal in nature but a determination that the *proceeding* [such as warrant signings] was a federal proceeding." Similarly, the Eighth Circuit, considering whether the requirement of Rule 41 that a search warrant must designate a federal magistrate judge to whom it should be returned is applicable to a warrant issued by a state court judge, held that it was not "applicable where a state court judge issues a state warrant for the violation of state law. The provision is a technical one which blueprints the procedure for the issuance of federal warrants and is not designed to protect the integrity of the federal courts or assure reasonableness on the part of federal law enforcement officers." *United States v. Sturgeon*, 501 F.2d 1270, 1275 (8th Cir. 1974). The Court concludes Rule 41 did not apply to the signing of these warrants because they were signed by a state law judge in a state law proceeding, not in a federal proceeding governed by Rule 41.

Moreover, even if Rule 41 applied here, the Court would not recommend suppression of the evidence resulting from the cellphone warrants. "Rule 41 and the

15

Fourth Amendment are not coextensive," and "[n]oncompliance with [Rule] 41

prerequisites does not automatically require the exclusion of evidence in a federal

prosecution." *United States v. Vann*, No. 07-cr-247 (JMR/RLE), 2007 WL 4372993, at

*21 (D. Minn. Oct. 25, 2007) (quoting *United States v. Schoenheit*, 856 F.2d 74, 76-77

(8th Cir. 1988)).  Thus, even where Rule 41 applies, the Eighth Circuit has held that

suppression is proper only where "(1) there was prejudice in the sense that the search

might not have occurred or would not have been so abrasive if the Rule had been

followed, or (2) there is evidence of intentional or deliberate disregard of a provision in

the rule." *United States v. Burgard*, 551 F.2d 190, 193 (8th Cir. 1977) (quotation

omitted) (declining to suppress evidence in violation of the daytime requirements of

Rule 41 where the agents' failure to comply resulted in no advantage to the government

and exclusion would be inappropriate); *see also United States v. Freeman*, 897 F.2d 346,

348 (8th Cir. 1990) (declining to exclude evidence where violations of Rule 41 did "not

implicate the constitutional values of probable cause or description with particularity of

the place to be searched and items to be seized").

Here, neither factor is satisfied.  There is no evidence of intentional or deliberate

disregard of a provision in Rule 41, and every reason to believe the search would have

occurred regardless of whether the order specified forty-five rather than sixty days; in

fact, when that time period expired, the same judge found probable cause still existed and

issued the second warrant.  Similarly, the failure to designate a magistrate judge for

return of the warrant does not warrant suppression.  *See United States v. Turner*, 781 F.3d

374, 387 (8th Cir. 2015) (declining to suppress evidence even where there were multiple

violations of Rule 41, including that there was no designation of a magistrate judge for return).

The same reasoning defeats Salazar's argument that the evidence should be suppressed because the warrants were issued in violation of the procedural requirements set forth in 18 U.S.C. § 3122 et seq.  Section 3123(a)(2) provides:

> Upon an application made under section 3122(a)(2), the court shall enter an ex parte order authorizing the installation and use of a pen register or trap and trace device within the jurisdiction of the court, if the court finds that the State law enforcement or investigative officer has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation.

Additionally, § 3123(b)(1)(C) provides that the order shall specify "the geographic limits of the order."  Salazar contends the cellphone warrants violated these statutes because they were executed outside the jurisdiction of the issuing court, and because the warrants did not adequately specify the geographic limits.

The Government failed to address this argument, but the Court nevertheless finds it unavailing.  Even if the geographic reach of the cellphone warrants exceeded the jurisdiction of the Blue Earth County judge,[6] the Court would not find exclusion to be appropriate.  "[C]ourts should be wary in extending the exclusionary rule in search and

---

[6] The Court notes that neither party addressed the underlying question of the scope of jurisdiction of a Minnesota state district court judge located in Blue Earth County with regard to issuing a warrant authorizing location tracking for a cellphone that is within the state of Minnesota, even if not within Blue Earth County, at the time the location tracking is initiated.  The Minnesota Court of Appeals has held that state "district courts have greater jurisdiction because the county courts were integrated into them" and a district court's order "is enforceable throughout the state."  *State v. Morris*, No. C7-96-2553, 1997 WL 559739, at *1 (Minn. Ct. App. Sept. 9, 1997) (approving a search warrant issued in Crow Wing County and executed in Cass County).

seizure cases to violations which are not of constitutional magnitude." *United States v. Burke*, 517 F.2d 377, 386 (2d Cir. 1975). As discussed below, the Court concludes there was probable cause to issue the search warrants. Applying the same standard and rationale that the Eighth Circuit has articulated in cases involving violations of Rule 41, described above, the Court finds no indication any provision of the statute was intentionally or deliberately disregarded, and no reason to believe that but for the alleged violation, the warrants would not have issued and the search would not have occurred even if the applications had been presented to another judge. Additionally, Salazar points to nothing in the record that suggests officers acted with intentional or deliberate disregard of any rule or statute. Moreover, the Eighth Circuit has held in the context of 18 U.S.C. § 3122 that "the statutory scheme (which is the same for trap and trace devices as for pen registers) does not mandate exclusion of evidence for violations of the statutory requirements." *United States v. Fregoso*, 60 F.3d 1314, 1320-21 (8th Cir. 1995). Accordingly, even if the warrants permitting installation and use of such devices violated 18 U.S.C. §§ 3122 and 3123, suppression of the evidence thereby obtained would not be warranted. *United States v. Harvey*, No. S1-4:02 CR 482JCHDDN, 2003 WL 22052993, at *24 (E.D. Mo. July 28, 2003).

### C.    Whether Probable Cause Supported the Warrants

Salazar next argues the cellphone warrants violated the Fourth Amendment because they were issued without probable cause. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. To that end, every search

warrant must be supported by probable cause, supported by a sworn affidavit, and

describe with particularity the place to be searched and the items or persons to be seized.

*Id.*  The task of a judge presented with a search warrant is "to make a practical, common-

sense decision whether, given all the circumstances set forth in the affidavit before him, .

. . there is a fair probability that contraband or evidence of a crime will be found in a

particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  As the very term implies,

probable cause "deal[s] with probabilities.  These are not technical; they are the factual

and practical considerations of everyday life on which reasonable and prudent men, not

legal technicians, act."  *Id.* at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 175

(1949)).  An affidavit establishes probable cause for a warrant "if it sets forth sufficient

facts to establish that there is a fair probability that contraband or evidence of criminal

activity will be found in the particular place to be searched."  *United States v. Libby*,

No. 15-CR-182 (DWF/LIB), 2016 WL 937908, at *9 (D. Minn. Feb. 11, 2016),

*R. & R. adopted*, 2016 WL 953234 (D. Minn. Mar. 11, 2016) (quoting *United States v.

Mutschelknaus*, 592 F.3d 826, 828 (8th Cir. 2010)); *see also United States v. Faulkner*,

14-cr-05 (JNE/TNL), 2014 WL 3384687, at *4-5 (D. Minn. July 10, 2014), *aff'd*,

826 F.3d 1139 (8th Cir. 2016).

A court reviewing a previous determination of probable cause must give "great

deference" to the issuing judge's assessment.  *Gates*, 462 U.S. at 236 (quotation omitted).

If the issuing judge "relied solely on the supporting affidavit to issue the warrant, 'only

that information which is found within the four corners of the affidavit may be considered

in determining the existence of probable cause.'"  *United States v. Etheridge*, 165 F.3d

19

655, 656 (8th Cir. 1999) (quotation omitted). The Court therefore examines the information provided to the issuing judge in connection with the applications for those warrants.

As already described, Special Agent Johnson's affidavit described his experience as a peace officer and in the investigation of narcotics. (Gov't Ex. 1 at 2.) He identified Salazar as a subject involved in a drug trafficking organization, and recounted that she had received shipments of methamphetamine from Arizona, had transported shipments from Arizona to Minnesota, had sold methamphetamine within Minnesota, and was suspected to be involved in the financial activities of the drug trafficking organization. (*Id.* at 3.) Her suspected involvement in the organization's financial dealings was corroborated by bank records obtained by Special Agent Johnson showing that $92,000 in cash had passed through Salazar's bank accounts over a two-month period of time, and that she had sent money to subjects in Mexico. (*Id.*)

The affidavit further included the content of text messages between an individual known as "Lil" and originating from the cellphone number for which tracking was sought, and a subject who had been arrested for possessing methamphetamine. (*Id.* at 3-4.) One of the text messages from "Lil" at the subject cellphone number contained the words "iliana y Salazar" followed by information for a bank savings account. (*Id.* at 4.) Special Agent Johnson affirmed that he also knew Salazar as "Lil." (*Id.*) Special Agent Johnson further stated that dealers in controlled substances commonly use cellphones as their primary means of communications to conduct transactions, including communications through voice or text messages with their customers and suppliers. (*Id.*

20

at 5.)  Applying his experience and expertise, Special Agent Johnson concluded the text messages pertained to the coordination of a drug payment.  (*Id.*)

Giving "great deference" to the issuing judge's assessment of probable cause, the Court concludes these facts were sufficient to show a nexus among Salazar, the subject cellphone number, and the suspected illegal activities of the drug trafficking organization, and were therefore sufficient to establish probable cause to believe that information about the location of the cellphone obtained through the requested tracking mechanisms would lead to evidence of those suspected illegal activities.  The Court concludes, therefore, that neither the March and May 2016 cellphone search warrants, nor the subsequently issued search warrant for the Georgia premises, violated Salazar's Fourth Amendment rights.

But even if probable cause was lacking, the Court finds that the good-faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897, 922 (1984), applies.  There has been no showing that the judge who issued the warrant "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."  *See id.* at 923.  The affidavit was not so lacking in probable cause that reliance on it was objectively unreasonable, nor was the warrant itself so facially deficient that its validity could not be presumed.  *See id.*  Finally, there is no evidence that the issuing judge "wholly abandoned his judicial role."  *See id.*  Law enforcement's reliance on the warrants was objectively reasonable based on their investigation connecting Salazar to the drug trafficking organization, facts appearing to show money laundering, and text messages appearing to allude to controlled substance transactions.  Therefore, even if probable cause were

21

lacking, here, as in *Leon*, exclusion of the evidence is not appropriate.

The Court therefore recommends denying Salazar's Motion to Suppress Evidence Obtained from Search and Arrest Warrants.


## V.    Recommendation

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Defendant's Motion to Suppress Statements [Doc. No. 81] be **DENIED**; and

2.  Defendant's Motion to Suppress Evidence Obtained from Search and Arrest Warrants [Doc. No. 83] be **DENIED**.


Dated:  March 23, 2017                  s/ *Hildy Bowbeer*
                                        HILDY BOWBEER
                                        United States Magistrate Judge


### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.